Hillsborough
No. 91-461

ANDRE BONTE f/n/f STEPHANIE BONTE,
AND ANDRE BONTE, individually

v.

SHARON BONTE

October 30, 1992

*Thomas Craig P.A.*, of Manchester (*Thomas Craig* and *H. Nina Bernard* on the brief, and *Ms. Bernard* orally), for the plaintiffs.

*Devine, Millimet & Branch P.A.*, of Manchester (*Andrew D. Dunn* and *Cynthia A. Satter* on the brief, and *Ms. Satter* orally), for the defendant.

THAYER, J. The sole question presented for our review is whether a child born alive can maintain a cause of action in tort

against his or her mother for the mother's tortious conduct that caused prenatal injury. The plaintiffs appeal from a motion to dismiss granted by the Superior Court (*Dalianis*, J.) on the ground that the pleadings failed to state a cause of action. For the reasons that follow, we reverse the trial court's order and remand.

The defendant, Sharon Bonte, when seven months pregnant, was struck by a car while crossing Elm Street in Manchester. She was taken to a local hospital emergency room where plaintiff Stephanie Bonte was delivered by emergency caesarean section the next day. Stephanie was born with catastrophic brain damage and has been diagnosed as having cerebral palsy. She is severely and permanently disabled and will require medical and supervisory care for the remainder of her life. Stephanie's father, Andre Bonte, brought this action individually, and as next friend of Stephanie, against the defendant, alleging that the defendant was negligent in failing to use reasonable care in crossing the street and failing to use a designated crosswalk. The defendant is represented by counsel provided by her insurance company, American Global.

■■ On appeal from a motion to dismiss, "[w]e will assume the truth of both the facts alleged in the plaintiff's pleadings and all reasonable inferences therefrom as construed most favorably to the plaintiff." *Collectramatic, Inc. v. Kentucky Fried Chicken Corp.*, 127 N.H. 318, 320, 499 A.2d 999, 1000 (1985). The motion to dismiss should be denied "[i]f the facts as alleged would constitute a basis for legal relief." *Id.*

■■ Our first inquiry is whether a child born alive may maintain a cause of action for injuries sustained while the child was in utero. We held in *Bennett v. Hymers*, 101 N.H. 483, 486, 147 A.2d 108, 110 (1958), that "an infant born alive can maintain an action to recover for prenatal injuries inflicted upon it by the tort of another . . . ." We stated:

> "In weighing the factors for and against allowing recovery we are impressed with the injustice of denying to a child born alive a right to recover for injuries which he might bear for the remainder of his life because of the tortious conduct of another. One cannot examine the cases in which a child, physically or mentally deformed for life as a result of prenatal injuries caused by the wrongful act of another, has been denied a right of recovery for such injuries, without being impressed by the harshness of such a result."

*Id.* (quotation omitted). In *Bennett* we did not limit those against whom the child may bring suit for injuries sustained while in utero, and, in fact, we recognized that the injuries suffered by the child while in the womb are "distinct and independent" from any injuries suffered by the mother. *Id.* at 485, 147 A.2d at 110 (quotation omitted).

Having established that New Hampshire case law permits a child to maintain a cause of action for negligence resulting in prenatal injury, we must next determine whether that child may maintain an action against his or her mother. In New Hampshire, the court-created doctrine of parental immunity was established for the first time in *Levesque v. Levesque*, 99 N.H. 147, 106 A.2d 563 (1954). In *Levesque*, the plaintiff sued his father for negligence in operating an automobile, which resulted in injuries to the plaintiff. *Id.* at 147, 106 A.2d at 563. Relying upon the "peace of society" and "sound public policy, designed to subserve the repose of families and the best interests of society," we held that an unemancipated minor could not maintain an action against his parent for bodily injury caused by the parent's negligence. *Id.* at 148, 106 A.2d at 564 (quotation omitted). Although we noted in *Levesque* that an argument against parental immunity was "the generally recognized fact" that most drivers carry liability insurance, we stated that the existence of insurance should not "create a right of action where none would otherwise exist." *Id.* at 148–49, 106 A.2d at 564.

We later abandoned the parental immunity doctrine, at least in part, in *Dean v. Smith*, 106 N.H. 314, 211 A.2d 410 (1965). In *Dean*, we considered whether unemancipated minor children, injured while passengers in a car driven by their father, could bring suit against their deceased father's estate for the father's negligence in operating the vehicle. In holding that such a cause of action could be maintained by the minors, we noted that parental immunity did not exist at common law and found no justification for application of the court-created parental immunity doctrine in suits against a deceased parent's estate. *Id.* at 316–17, 211 A.2d at 412–13. Although we recognized that the existence of insurance should not create a cause of action, we stated that "the effect of general insurance coverage by most motorists should be considered in determining whether the barrier preventing an unemancipated child from obtaining redress for the wrongs inflicted on him by the negligence of his parent should be removed." *Id.* at 318, 211 A.2d at 413. We explained that the existence of insurance decreases the likelihood that the minor's cause of action will disrupt family harmony or deplete the family exchequer,

all arguments in favor of parental immunity. *Id.* at 317–18, 211 A.2d at 413.

The following year, we extended the *Dean* holding in *Briere v. Briere*, 107 N.H. 432, 224 A.2d 588 (1966), and abolished the court-created parental immunity doctrine adopted in *Levesque*. The issue presented in *Briere* was whether unemancipated children could sue their father in tort for injuries sustained in an automobile accident. We examined arguments in favor of parental immunity including: preservation of parental authority and family harmony; depletion of the family exchequer; and the danger of fraud and collusion. *Id.* at 434–35, 224 A.2d at 590–91. While those considerations were admittedly valid, we determined that none were truly unique to a lawsuit between parent and child, nor did "[t]hey furnish . . . sufficient grounds for denying unemancipated minors as a class a right commonly enjoyed by other individuals." *Id.* at 436, 224 A.2d at 591. We stated that "as a practical matter, the prevalence of insurance cannot be ignored in determining whether a court should continue to discriminate against a class of individuals by depriving them of a right enjoyed by all other individuals." *Id.* at 435, 224 A.2d at 590. In abolishing the parental immunity doctrine for tort actions, we noted the inconsistency in allowing suits between a minor and his parent based upon contract or for the protection of property rights, but disallowing an action in tort. *Id.* at 435–36, 224 A.2d at 591.

Because our cases hold that a child born alive may maintain a cause of action against another for injuries sustained while in utero, and a child may sue his or her mother in tort for the mother's negligence, it follows that a child born alive has a cause of action against his or her mother for the mother's negligence that caused injury to the child when in utero.

The defendant urges us to immunize the mother from tort liability based upon public policy reasons grounded in the unique relationship of the pregnant woman to her fetus. While we recognize that the relationship between mother and fetus is unique, we are not persuaded that based upon this relationship, a mother's duty to her fetus should not be legally recognized. If a child has a cause of action against his or her mother for negligence that occurred after birth and that caused injury to the child, it is neither logical, nor in accord with our precedent, to disallow that child's claim against the mother for negligent conduct that caused injury to the child months, days, or mere hours before the child's birth.

The defendant further argues that public policy dictates against the plaintiff's cause of action because allowing this matter to pro-

ceed "deprives women of the right to control their lives during pregnancy . . . [and] unfairly subjects them to unlimited liability for unintended and often unforeseen consequences of every day living." We disagree that our decision today deprives a mother of her right to control her life during pregnancy; rather, she is required to act with the appropriate duty of care, as we have consistently held other persons are required to act, with respect to the fetus. The mother will be held to the same standard of care as that required of her once the child is born. Whether her actions are negligent is a determination for the finder of fact, considering the facts and circumstances of the particular case. Moreover, if a determination based upon public policy can be made denying a cause of action logically recognized by our case law, that determination should be made by the legislature.

■ Accordingly, we hold that a child born alive has a cause of action in tort against his or her mother for the mother's negligent conduct that results in prenatal injury.

*Reversed and remanded.*

JOHNSON, J., concurred specially; HORTON, J., concurred; BROCK, C.J., and BATCHELDER, J., dissented.

JOHNSON, J., concurring specially: In this case the defendant filed a detailed motion to dismiss on the basis that "New Hampshire law has not specifically adopted or recognized a cause of action by an infant or the infant's father against the infant's mother for prenatal injuries." The trial court ruling stated: "Granted; the Court is of the opinion that all new causes of action should be established, if at all, by either the legislature or the Supreme Court."

I agree with Chief Justice Brock and Justice Batchelder that the legal relationship between a mother and her fetus is irrefutably unique and that we should approach this particularly sensitive legal issue with utmost care and caution. The right of a child to bring suit against his or her mother for injuries caused to the child before birth is fraught with difficult issues which should be resolved by a careful, case-by-case development of the law.

However, I believe that the negligent acts of the mother alleged in this case are actionable because a breach of the duty of care owed to her fetus could foreseeably cause serious harm to the unborn child. I, therefore, concur with Justices Thayer and Horton that a cause of action has been stated.

BROCK, C.J., and BATCHELDER, J., dissenting: The majority concludes that because parental immunity has been abrogated and we

previously have recognized that a child born alive may maintain a cause of action against a third party for prenatal injuries, "it follows that a child born alive has a cause of action against his or her mother for the mother's negligence that caused injury to the child when in utero." In our view, the majority has failed to fully appreciate the extent of the intrusion into the privacy and physical autonomy rights of women—policy concerns which are central to this issue—and has ignored the profound implications that such a rule of law holds for all women in this State who are, or may become, pregnant.

The majority's willingness to extend liability to the mother rests largely upon an extension of third-party liability. Admittedly, the step from third party liability to maternal liability follows as a matter of logic. However, whether to subject the day-to-day decisions and acts of a woman concerning her pregnancy to judicial scrutiny is not properly a question to be decided by a mechanical application of logic. Rather, "[i]t is the policy of the law which must establish a reasonable limitation on liability," *Wallace v. Wallace*, 120 N.H. 675, 677, 421 A.2d 134, 136 (1980) (relying on policy grounds rather than logic and science in deciding not to extend a cause of action for wrongful death to a nonviable fetus), and the policy "must be distilled from the relevant factors involved upon an inquiry into what is fair and just." *England v. Tasker*, 129 N.H. 467, 470, 529 A.2d 938, 940 (1987) (quotation omitted).

Virtually all jurisdictions, ours included, allow a child born alive to recover for injuries sustained as a viable fetus caused by the negligence of a third party. The cause of action is based upon the recognition that the child has a "right, to the fullest extent possible, to be born with a sound mind and body." Beal, *"Can I Sue Mommy?" An Analysis of a Woman's Tort Liability for Prenatal Injuries to her Child Born Alive*, 21 SAN DIEGO L. REV. 325 (March 1984). While we recognize the validity of this right and its significance as one factor in the policy inquiry, we are deeply concerned that the assertion of such a right against the mother, as compared to a third party, will have vastly different consequences.

Holding a third party liable for negligently inflicted prenatal injuries furthers the child's legal right to begin life free of injuries caused by the negligence of others, but does not significantly restrict the behavior or actions of the defendant beyond the limitations already imposed by the duty owed to the world at large by long standing rules of tort law. Third parties, despite this recently imposed duty to the fetus, are able to continue to act much as they did before the cause of action was recognized. Imposing the same duty on the

mother, however, will constrain her behavior and affirmatively mandate acts which have traditionally rested solely in the province of the individual free from judicial scrutiny, guided, until now, by the mother's sense of personal responsibility and moral, not legal, obligation to her fetus.

Although it is true that the law may impose liability based on the special relationship between certain parties, we can think of no existing legal duty analogous to this one, which could govern such details of a woman's life as her diet, sleep, exercise, sexual activity, work and living environment, and, of course, nearly every aspect of her health care. Imposing a legal duty upon a mother to her fetus creates a legal relationship which is irrefutably unique. "No other plaintiff depends exclusively on any other defendant for everything necessary for life itself . . . . As opposed to the third-party defendant, it is the mother's every waking and sleeping moment which, for better or worse, shapes the prenatal environment which forms the world for the developing fetus. That this is so is not a pregnant woman's fault: it is a fact of life." *Stallman v. Youngquist*, 125 Ill. 2d 267, 278–79, 531 N.E.2d 355, 360 (1988).

The majority discounts the problems associated with legally recognizing a mother's duty to her fetus and assures, that by subjecting the relationship to an "appropriate duty of care" and by allowing the factfinder to make a determination of negligence, no significant rights will be deprived. This conclusion begs the question: What will be the judicially defined standard of conduct for a pregnant woman? Indeed, is it possible to subject a woman's judgment, action, and behavior as they relate to the well-being of her fetus to a judicial determination of reasonableness in a manner that is consistent and free from arbitrary results? We have serious doubts.

While we are less troubled with the role of the factfinder in assessing foreseeability, despite the myriad circumstances and complexities of the factors at play, we question whether the nature and scope of the duty can be articulated with consistency and predictability by the courts. Presumably, the determination would "vary according to whether a pregnancy was planned or unplanned, to whether a woman knew she was pregnant soon after conception or only knew after several months, to whether she had the financial resources with which to access the best possible medical care available or was unable to get any prenatal care." *Youngquist*, 125 Ill. 2d at 279, 531 N.E.2d at 360. In addition to these general circumstances, the court would have to consider the more specific day-to-day decisions of the mother and the detailed circumstances surrounding her pregnancy.

Moreover, because "[t]he extent of duty can seldom, if ever, be determined until all the facts of a transaction in its environmental setting are known, and some appropriate rule of law is found available," the question of duty is, unfortunately, one of hindsight. Green, *Foreseeability in Negligence Law*, 61 COLUM. L. REV. 1401, 1418 (1961). Such after-the-fact judicial scrutiny of the subtle and complicated factors affecting a woman's pregnancy may make life for women who are pregnant or who are merely contemplating pregnancy intolerable. For these reasons, we are convinced that the best course is to allow the duty of a mother to her fetus to remain a moral obligation which, for the vast majority of women, is already freely recognized and respected without compulsion by law.

This issue is difficult, and we have not reached our conclusion with ease or without doubts. The countervailing concerns for the child's right to be born free of negligently inflicted prenatal injuries and his or her right to recover for such harm are significant. We are also aware that a fetus may sustain injuries from the negligent acts of its mother that may not directly implicate the unique relationship between mother and fetus. We are concerned, however, that a rule of law attempting to distinguish between acts of the mother that involve privacy interests and those that may be considered common torts would result in arbitrary line-drawing resulting in inconsistent verdicts. On this point, we find the cases dealing with partial abrogation of parental immunity excepting for acts involving "the exercise of parental authority and discretion" to be closely analogous and instructive. *See Hartman by Hartman v. Hartman*, 821 S.W.2d 852, 856–57 (Mo. 1991) (en banc) (rejecting parental immunity exceptions because of arbitrary distinctions between acts unique to parenting and those that are not).

We conclude that if a cause of action based upon public policy can be created with sufficient safeguards protecting the mother's privacy interests, it should be fashioned by the legislature. Until then, as a matter of both judicial and public policy, we would decline to recognize a cause of action by a child born alive against his or her mother for the mother's negligent acts resulting in prenatal injury.