Original
No. LD-91-001

# Jones' Case

July 2, 1993

*Ouellette, Hallisey, Dibble and Tanguay, P.A.*, of Dover (*Dennis L. Hallisey* on the brief and orally), for the committee on professional conduct.

*Orr & Reno, P.A.*, of Concord (*Ronald L. Snow* and *Christopher T. Walsh* on the brief, and *Mr. Snow* orally), for the respondent.

PER CURIAM. The committee on professional conduct (the committee) has petitioned this court to disbar the respondent, Carroll F. Jones, citing alleged violations of both the Code of Professional Responsibility (in effect for conduct prior to February 1, 1986) and the Rules of Professional Conduct, bearing upon the respondent's fitness and qualification as a practicing attorney. On April 4, 1991, we appointed a Judicial Referee (*Bean*, J.) to conduct a hearing on the committee's petition. The referee found, by clear and convincing evidence, that the respondent violated Rules 3.4(d), 8.4(c), and 8.4(a) of the Rules of Professional Conduct (the Rules). Although the respondent does not challenge the referee's findings, he maintains that the violations were "*de minimis*," "very brief," and do not warrant disbarment.

The underlying facts follow. From 1981 to 1985, Bruce Kenna was an Assistant United States Attorney in the Office of the United

States Attorney for the District of New Hampshire. During the summer of 1985, Kenna had a serious policy disagreement with Richard Wiebusch, the newly appointed United States Attorney in charge of the office. On September 18, 1985, after Wiebusch was unsuccessful in seeking Kenna's voluntary resignation or transfer to another office, Wiebusch wrote to his superiors at the United States Department of Justice (the DOJ), seeking permission to discharge Kenna and detailing the reasons for his request. This letter (the removal letter) is the catalyst for the events that culminated in the committee's petition for the respondent's disbarment.

In early October 1985, Kenna engaged the respondent to represent him in connection with the threatened termination. One of the initial objectives of the representation was to obtain a copy of the removal letter. Although Kenna had been given an opportunity to respond to the allegations in the removal letter by his superiors in the DOJ, he was provided with only a summary of its contents.

Sometime in mid to late October, the removal letter was, without authority, photocopied and delivered to Kenna's home. Kenna, in turn, gave the copy to the respondent. Kenna and the respondent part company at this point regarding what happened next. Kenna maintains that he told the respondent to keep the letter confidential because he believed that it would destroy his chances of continued employment as an Assistant United States Attorney, and would jeopardize the employment of the individual or individuals responsible for making the copy available to him. The respondent contends that it was his understanding that Kenna did not want the source of the letter disclosed, as opposed to its contents.

In a deceitful maneuver designed to force the DOJ to provide Kenna with a copy of the removal letter, the respondent gave the letter to two local news reporters. Very soon thereafter, articles discussing the dissension in the United States Attorney's Office and containing excerpts from the removal letter appeared in *Foster's Daily Democrat* on October 31, 1985, and in the Manchester *Union Leader* on November 1, 1985. On November 6, 1985, the respondent established the first link in the chain of deception surrounding the removal letter. He wrote to the officials in the DOJ:

> "To date, neither my client nor I have received [the removal letter] although it is evident from the newspaper articles concerning the dispute in the U.S. Attorney's Office that the letter has been furnished to members of the press. Since it is already within the public domain, I can see no purpose to be

served by the Department's failure to furnish it promptly to me."

Shortly thereafter, Kenna and the respondent received an official copy of the letter from the DOJ.

After seeing the article containing excerpts of the removal letter in the *Union Leader*, Kenna telephoned the respondent and asked if he knew how the newspapers got a copy of the letter. The respondent laughed and said that they most likely had gotten the letter from Wiebusch or "anybody." The respondent maintains that his response was intended to be "facetious" and he assumed Kenna knew that he was joking. Kenna contends that he did not realize that the respondent was joking and, therefore, that he accepted the respondent's remark as true.

Kenna was officially discharged from his employment with the United States Attorney's Office in December 1985. Because Kenna was unemployed and presumably could not afford the respondent's legal fees, the respondent agreed to continue to represent him on an hourly basis, but with the understanding that Kenna would prepare all pleadings and do any necessary research, while the respondent would sign all documents, argue motions, take depositions, and try the case if necessary. In March 1986, Kenna filed suit against the Department of Justice and certain named officials within the Department, including Wiebusch. The complaint was prepared by Kenna and signed by the respondent and alleged, among other things, wrongful discharge, deprivation of liberty interest, and conspiracy. In particular, in paragraph 69 of the complaint, Kenna asserted that "[o]n October 31, 1985, local newspapers in New Hampshire began publishing excerpts from defendant Wiebusch's letter of September 18, 1985 [the removal letter]."

The defendants filed a motion to dismiss or, in the alternative, for summary judgment, based in part on Kenna's failure to establish the elements of a liberty interest claim. Specifically, the motion stated: "While plaintiff does allege that portions of Mr. Wiebusch's letter were published in a local newspaper, Complaint ¶ 69, he conspicuously does *not* allege that anyone in the government provided Mr. Wiebusch's letter to the newspaper, or to anyone else outside of the government." Kenna objected to the defendants' motion and responded, in a memorandum of law signed by the respondent, that "[c]ontrary to the defendants' assertions, the plaintiff has alleged dissemination of defamatory material by the government."

The defendants then filed a reply memorandum in support of their motion to dismiss or, in the alternative, for summary judgment. Once

again, the defendants argued that Kenna's liberty interest claim was deficient.

> "Little need be said about plaintiff's liberty claim. The most obvious defect in the claim is that plaintiff nowhere alleges that *the government* published any defamatory information about the plaintiff. Plaintiff merely claims that a local newspaper 'obtained copies of the defendant Wiebusch's letter of September 18, 1985, *from some source.*'"

The defendants referred the court to an attached newspaper article, "which [would] shed[ ] considerable light on the source of the publicity in this case." The article, penned by the same *Union Leader* reporter who had written about Kenna's troubles with Wiebusch, including excerpts from the removal letter, praised the respondent and one of his law partners, noting their "aggressive use of the public forum to represent their clients." The respondent forwarded the reply memorandum to Kenna along with a cover note stating, "I think we gottem on the 'leaks.' . . . Do we want to respond further?"

Kenna prepared a reply. In the liberty interest section he stated, "Plaintiff does not know who provided that letter to reporter Rod Paul prior to publication of the first article which appeared in *Foster's Daily Democrat* on October 31, 1985." By footnote to this statement, Kenna noted that Rod Paul was the same reporter who interviewed Wiebusch and published an article which sparked the initial dissension in the United States Attorney's Office, thereby suggesting that Wiebusch leaked the letter. Kenna also attached an affidavit in which he reiterated that he did not leak the letter and added, "I believe that the government—through one of its representatives—caused publication of that letter." By telephone, the respondent authorized Kenna to sign and file this response.

In September 1986, the federal district court heard oral argument on the defendants' motion to dismiss or, in the alternative, for summary judgment. The respondent argued the case for Kenna. The court dismissed four of the seven counts in the complaint and directed Kenna to file a conformed complaint containing only the three remaining counts. The conformed complaint, again signed by the respondent, repeated verbatim paragraph 69 concerning the leak of the removal letter to the press.

A flurry of discovery activity followed. Kenna propounded, and the respondent signed, numerous interrogatories and requests for admission. Among them was a request that Wiebusch admit that he released the removal letter to the press. On November 9, 1987,

Kenna was deposed and specifically denied any knowledge regarding the leak. According to the respondent, it was at this deposition that he first became aware that Kenna did not know that the respondent had given the removal letter to the press.

The following day, the defendants deposed one of the secretaries who had given the copy of the removal letter to Kenna. The following exchange occurred:

"[The respondent]: You were working in the office at the time Mr. Wiebusch came on board as U.S. Attorney.

[Secretary]: Yes, I was.

Q. And it's true, isn't it, that he was often visited by members of the media, both print and television, and that sort of thing in the office.

A. I can remember a couple of occasions, yes.

Q. And he would meet with the members of the press in his office.

A. Yes, he would.

Q. And he'd close the door; wouldn't he?

A. Yes, he would.

Q. So you didn't know what they were giving him?

A. No, I did not.

Q. Or what he was giving them.

A. No."

The secretary subsequently acknowledged that she had provided Kenna with a copy of the removal letter.

This deposition prompted the defendants to seek to redepose Kenna and submit a second set of interrogatories focusing on any information either Kenna or the respondent had about the leak. When Kenna resisted these efforts, the defendants subpoenaed the respondent to be deposed. The respondent moved to quash the subpoena, citing the attorney-client privilege. Following the hearing on the motion to quash, the court deferred decision but ordered Kenna to answer the second set of interrogatories, based on both his own knowledge and that of the respondent. In early December 1987, Kenna submitted answers to these interrogatories stating that the respondent had provided the removal letter to the press.

The defendants moved for sanctions against both Kenna and the respondent under Federal Rule of Civil Procedure 11, seeking attorneys' fees and expenses attributable to discovery surrounding the source of the leak. On November 9, 1989, sanctions were imposed jointly and severally against Kenna and the respondent in the amount of $17,127, of which each paid fifty percent.

The defendants also forwarded a copy of the sanction materials to the committee, which, following hearings, has filed this petition for disbarment with the court. We appointed a referee who found, by clear and convincing evidence, that the respondent violated Rule 3.4(d) by making a frivolous discovery request; Rule 8.4(c) by failing to disclose material facts, such failure being deceit and misrepresentation; and Rule 8.4(a), which makes such misconduct a violation of the Rules.

In reviewing the referee's findings, ordinarily we determine whether a reasonable person could have reached the same outcome as the referee, based on the evidence presented. *Welts' Case*, 136 N.H. 588, 590, 620 A.2d 1017, 1018 (1993). In this case, however, the propriety of the referee's findings is not before us.

Although the petition for disbarment alleged several violations of the Code of Professional Responsibility as well as the Rules of Professional Conduct, the referee ruled that only three Rules were violated. The committee urges us to overrule the referee's determination and hold that the respondent's conduct violated additional provisions, as alleged in the petition for disbarment. The respondent, however, asks us to uphold the referee's determination, conceding that his conduct violated Rules 3.4(d), 8.4(c), and 8.4(a). We need not respond to the committee's request for further violations, however, because "[t]he gravity of unprofessional conduct is not determined solely by the number of rules broken or by the particular rules violated, but is determined largely with reference to the attorney's behavior." *Flint's Case*, 133 N.H. 685, 689, 582 A.2d 291, 293 (1990). Consequently, our only inquiry is the appropriate sanction to be applied.

The respondent represents to this court that he "either did not review at all or did not read carefully either the original or reply submissions prepared by Mr. Kenna prior to these documents being filed with the court." In essence, he asks us to believe that he served merely as a conduit, shuffling papers from Kenna to the court and back. The respondent's participation was more active, however. For example, he travelled with Kenna to Rhode Island where he argued

in opposition to the defendants' motion to dismiss or, in the alternative, for summary judgment. Nevertheless, he contends that he was unaware of the implication regarding the source of the leak contained in the pleadings and the subsequent allegations in the responsive motions. The referee found, however, that "[a]s these documents were necessary in preparation for an oral argument, it is inconceivable that Jones did not know their content." We note also that Judge Torres, sitting on the Rule 11 sanction motion, likewise determined that "it is inconceivable that [the respondent] could have argued that motion without being aware of Kenna's claim since the motion was predicated in part on the contention that the claim was false." *Kenna v. U.S. Dept. of Justice*, 128 F.R.D. 172, 177 (D.N.H. 1989). Similarly, we find no merit in the respondent's assertion that he was unaware of the content of the documents. Moreover, the note he sent to Kenna when he forwarded the motion, *i.e.*, "I think we gottem on the 'leaks,'" clearly indicates his awareness of the motion's contents.

The respondent maintains that the leak issue "was not material to anything that I knew was being claimed in the case so I didn't care." His reliance on his belief in the leak's insignificance in the case is misplaced. "Respondent's personal belief that the information he misrepresented and/or concealed from the other parties was insignificant under the circumstances no more negates the improper and unethical nature of these acts than does the fact that an attorney who misappropriated client funds merely intended to borrow rather than steal." *Matter of Silverman*, 113 N.J. 193, 213, 549 A.2d 1225, 1238 (1988).

In support of a lesser sanction, the respondent argues that his violations were "*de minimis*." We find this argument to be unpersuasive. That the referee found only two instances of frivolous discovery requests, *i.e.*, the request for Wiebusch's admission that he was the source of the leak and the deposition questioning of the secretary about Wiebusch's "behind closed doors" dealings with the press, does not temper the respondent's misconduct.

> "Due to sloth, inattention, or desire to seize tactical advantage, lawyers have long indulged in dilatory practices. A number of factors legitimately may lengthen a lawsuit, and the parties themselves may cause some of the delays. Nevertheless, many actions are extended unnecessarily by lawyers who exploit or abuse judicial procedures, especially the liberal rules for pretrial discovery."

*Roadway Express, Inc. v. Piper*, 447 U.S. 752, 757 n.4 (1980) (citation omitted). The respondent's conduct fits squarely within this category.

■ We are similarly unpersuaded that the sanction should be less severe because the misconduct was "very brief." At the time of Kenna's deposition, at the very latest, the respondent definitely knew that Kenna was unaware that the respondent had been the source of the leak to the press. The respondent, however, said nothing. That the misrepresentation may have been brief is not the issue. It is the nature of the underlying misconduct, not its duration, that seriously deviates from professional norms.

The respondent would have us view his misconduct as separate, minor violations of the Rules, none of which standing alone rises to the level of misconduct requiring disbarment. As we have already noted, however, the gravity of the misconduct is determined by the underlying acts and omissions, not by the number of rules violated. *Flint's Case*, 133 N.H. at 689, 582 A.2d at 293. Moreover, "[a] pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation." N.H. R. PROF. CONDUCT 8.4 ABA model code comments. Consequently, it is the litany of events described above, not the particular rule violations, that governs our imposition of the appropriate sanction in this case.

■ We next determine whether any mitigating factors exist. *See Welts' Case*, 136 N.H. at 592, 620 A.2d at 1019. The respondent offers three mitigators that he argues justify a reduction in the degree of discipline to be imposed. *See* LAWS. MAN. ON PROF. CONDUCT (ABA/BNA) 01:839-41 to -42 (June 17, 1992). First, he notes that he has already been sanctioned in the Rule 11 proceeding and has paid $8,563.50 to the defendants. That the respondent has already paid a substantial penalty for his misconduct "is a circumstance to be considered but does not provide absolution from the charges made by this complaint." *Wholey's Case*, 110 N.H. 449, 450, 270 A.2d 609, 610 (1970).

■ Second, he contends that his lack of intent to profit financially from his misconduct mitigates toward a less severe sanction. *See Edes' Case*, 118 N.H. 815, 817, 395 A.2d 498, 499 (1978). Although we do not disagree with the respondent's assertion, we note that every case must be judged on its own facts and circumstances. *Flint's Case*, 133 N.H. at 689, 582 A.2d at 293. In this case, we simply do not know what caused the respondent to choose the course of conduct outlined above.

■■ Finally, the respondent points to his previously flawless reputation throughout his twenty years of practice as a member of the New Hampshire Bar. Absence of a prior disciplinary record is an acknowledged mitigator, but it does not dispense with the necessity for disciplinary action. *Broderick's Case*, 104 N.H. 175, 178, 181 A.2d 647, 650 (1962). Moreover, substantial experience in the practice of law is an aggravating circumstance that may justify an *increase* in the degree of discipline to be imposed. LAWS. MAN. ON PROF. CONDUCT, *supra* at 01:839-41.

■ "When faced with the decision of whether to impose the ultimate sanction of disbarment, our focus rests, not on punishing the offender, but on protecting the public, maintaining public confidence in the bar, and preventing similar conduct in the future." *Astles' Case*, 134 N.H. 602, 605, 594 A.2d 167, 170 (1991). "By removing from the profession a person whose misconduct has proved him unfit to be entrusted with the duties and responsibilities belonging to the office of an attorney, the public and those charged with the administration of justice are protected." *Otis' Case*, 135 N.H. 612, 619, 609 A.2d 1199, 1204 (1992) (quotation omitted).

The practice of law is a privilege. This privilege, however,

> "does not come without the concomitant responsibilities of truth, candor and honesty. In fact, it can be said that the presence of these virtues in members of the bar comprises a large portion of the fulcrum upon which the scales of justice rest. Consequently, an attorney's character must remain beyond reproach."

*Maryland St. Bar Ass'n v. Agnew*, 271 Md. 543, 549, 318 A.2d 811, 814 (1974).

■ The respondent's November 6, 1985, letter to the DOJ requesting a copy of the removal letter because it had already been "furnished to members of the press" initiated the deception. This particular malefaction was, at the least, a dirty trick. By feigning innocent victimization at the hands of the press, the respondent convinced the DOJ to provide Kenna with a copy of the removal letter. At the same time, the respondent had the letter in his hands, gained from a source in a manner that, cast in a charitable light, appears highly questionable.

Moreover, we cannot condone the respondent's attempts to bring into play the force and authority of the federal judiciary to resolve a question contrived by him, to which he had the answer all along,

calculated to cast his adversary in a most unfavorable light in the eyes of the court. The courts of our land are looked to for the protection of the rights of each of us in regulating disputes that inevitably arise in a free society. To lay waste the energies of the judicial system which protects us all is grievous misconduct indeed.

The respondent's dogged assertion that he was unaware of the contents of documents that formed the nucleus of his client's case is disingenuous. Carroll F. Jones is hereby disbarred. Further, he is ordered to reimburse the committee for the costs of investigating and prosecuting this matter. SUP. CT. R. 37(16).

*So ordered.*

BROCK, C.J., and THAYER, J., did not sit; the others concurred.