Carroll
Nos. 93-519
 93-527
 93-564

MARK AND KATHY ARANSON

v.

ROBERT H. SCHROEDER & a.

October 31, 1995

*Sheehan, Phinney, Bass & Green, P.A.*, of Manchester (*Edward A. Haffer* and *Daniel J. Lynch* on the brief, and *Mr. Haffer* orally), for the plaintiffs.

*Nelson, Kinder, Mosseau, & Gordon, P.C.*, of Manchester (*Peter G. Beeson* and *Robert M. Daniszewski* on the brief, and *Mr. Beeson* orally), for the defendants.

BATCHELDER, J. The Superior Court (*O'Neil*, J.) has transferred, without ruling, the following three questions of law:

 A. Does a cause of action exist against a person who allegedly created false material evidence while acting as defense counsel in a previous case and, after withdrawing as counsel, allegedly gave false testimony advancing such evidence?

 B. If so, what are the elements of such a new cause of action?

 C. Does such cause of action also exist against such counsel's firm?

In addition, the trial court transferred two questions of law with ruling:

 D. Did the Superior Court err in ruling that defendants are collaterally estopped from litigating the issue of the reasonableness of plaintiffs' attorneys' fees in the underlying case?

 E. Did the Superior Court err in ordering plaintiffs to produce attorney-client and work product materials?

We address each question in turn.

For purposes of this opinion only, we will assume the underlying facts to be as follows: On March 18, 1988, at a real estate closing at defendant Robert Schroeder's office, the plaintiffs, Mark and Kathy Aranson, acquired title to a condominium unit in Conway from the Woodland Road Realty Trust. Approximately eight months later, the Town of Conway (the town) brought suit against the trust, the trustees, and the plaintiffs on the theory that the condominium unit had been sold without a certificate of occupancy as required by local ordinance.

Schroeder and his law firm initially represented the trust and the trustees in the town's suit. The plaintiffs, however, obtained inde-

pendent counsel and brought a counterclaim against the trust and the trustees, seeking, among other things, to rescind the purchase of the unit under the terms of the condominium statute, RSA chapter 356-B (1984 & Supp. 1994), and to recover treble damages under the Consumer Protection Act, RSA chapter 358-A (1984 & Supp. 1994). The plaintiffs' counterclaim was severed from the action brought by the town.

The town prevailed in its action against the trust, the trustees, and the plaintiffs. The plaintiffs, however, prevailed at a jury-waived trial in Superior Court (*Temple, J.*) on the counterclaim. They were awarded rescissionary relief, consequential damages of $172,339.06, and attorney's reasonable fees, determined in a subsequent hearing in Superior Court (*Mohl, J.*) to be $53,042.75 plus $3,851.85 in disbursements. The trust and the trustees appealed the award against them, and we summarily affirmed by order dated July 5, 1991. Although the plaintiffs have pursued their New Hampshire judgment in the Massachusetts courts where the trustees reside, they have not collected a farthing.

The plaintiffs in this new action ask us to recognize a cause of action for the tort of malicious defense, define its elements, and determine whether an attorney's law firm is also subject to liability. In effect they seek an aspect of tort reform, the recognition at common law of a remedy where heretofore none has existed. The success of the plaintiffs' action depends upon what took place at the real estate closing and the subsequent actions taken by Schroeder in his role as counsel for the trust and the trustees in defense of the counterclaim. In this regard, the Superior Court (*Temple, J.*) found:

> Crucial to determining most of this case are the facts surrounding the closing that took place March 18, 1988. Sometime before that date, plaintiff Mark Aranson had called the Town offices relative to whether there were any problems in buying the unit from the defendants and he was advised that there [were] not. According to defendant John Thompson, the occupancy permit was discussed at the closing, stating that Mr. Aranson had said that the permit was all set and that he had checked with the building inspector. Mr. and Mrs. Aranson, as well as the selling agent of the defendants, deny that any discussion concerning the permit, or the call Mr. Aranson made to the building inspector's office, took place at the closing. *A memorandum concerning this alleged discussion was prepared by Attorney Robert Schroeder, who represented the financing bank at the closing in his office.* Attorney Schroeder had no

independent recollection of this conversation. *The memo's reference to the presence of defendant Richard Sokolow at the closing, which did not occur, and the fact that the existence of the memo was made known only subsequent to pleadings being filed by the plaintiffs, causes the Court to find that this undated memo was likely prepared after consultation between the defendants and Attorney Schroeder subsequent to the defendants learning of the plaintiffs' position and claims.*

The Court accepts the plaintiffs' contentions that the discussion concerning the permit and telephone call did not take place at the closing. Further, the Court finds that the plaintiffs did not know of the occupancy permit requirement until they were informed of such when suit was brought by the Town of Conway.

The evidence shows that the plaintiffs Aranson did not know at the closing that no certificate of occupancy existed for the unit and that the plaintiffs Aranson did rely upon the representations made by the defendants relative to the unit purchased that all approvals had been obtained, that construction was complete with stated warranty. Testimony proved that the unit would not have been purchased had the plaintiffs known of the lack of certificate and building deficiencies causing the Town to withhold the certificate.

(Emphasis added.)

The essence of the plaintiffs' argument is captured in three sentences in their brief:

The cause of action [malicious defense] . . . is essentially the mirror image of § 674 of the Restatement (2d) of Torts, and would do for false defenses what §674 already does for false claims: provide a remedy. The present state of the law — condemning false evidence from the plaintiff's side but arguably tolerating it from the defendant's side — is one-sided and unfair. Both forms of misconduct should be treated the same; both should be condemned, and made the subject of damages.

In *Rockhouse Mountain Property Owners Association, Inc. v. Town of Conway*, 127 N.H. 593, 503 A.2d 1385 (1986), we were likewise asked to recognize a new cause of action. *Rockhouse* is helpful in giving guidance for the task at hand:

As in any case in which we are asked to recognize a new cause of action, it is a question of policy whether it would be

wise to provide the relief that the plaintiffs seek. Reaching an answer to this question requires two quite separate steps, for we must determine whether the interest that the plaintiffs assert should receive any legal recognition and, if so, whether the relief that the plaintiffs request would be an appropriate way to recognize it.

*Id.* at 597-98, 503 A.2d at 1387-88 (citation omitted).

In deciding this question, we keep in mind that the New Hampshire Constitution provides:

Every subject of this state is entitled to a certain remedy, by having recourse to the laws, for all injuries he may receive in his person, property, or character; to obtain right and justice freely, without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws.

N.H. CONST. pt. I, art. 14.

The analytical predicate to any consideration of the transferred questions must be a determination that the relief sought is not obtainable by other existing legal remedies. The plaintiffs seek consequential and special damages, costs, interest, attorney's fees, and enhanced compensatory damages—the same damages to which they would have been entitled in a successful suit for malicious prosecution. *See* RESTATEMENT (SECOND) OF TORTS § 681 (1977).

██ The plaintiffs characterize their action as a variant of the tort of malicious prosecution, *see Hogan v. Robert H. Irwin Motors, Inc.*, 121 N.H. 737, 739, 433 A.2d 1322, 1324 (1981), which originated in the misuse of the criminal process and has been adopted to redress malicious civil prosecution as well, *see Kolka v. Jones*, 71 N.W. 558, 559 (N.D. 1897). In the civil arena, wrongs of this sort are frequently presented as abuse of process actions. *See, e.g., Long v. Long*, 136 N.H. 25, 30, 611 A.2d 620, 623 (1992). Although separate and distinct, malicious prosecution and abuse of process "have the common element of an improper purpose in the use of legal process, and there are many cases in which they overlap and either will lie." W. KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS 898 (5th ed. 1984).

Absent a remedy for malicious defense, the plaintiffs have, on the facts before us, only a claim that sanctions be imposed by the trial court based upon the use of false evidence by the defendants. *See, e.g., Harkeem v. Adams*, 117 N.H. 687, 690-91, 377 A.2d 617, 619 (1977). In appropriate circumstances, there may be ample reason to

extend the reach of the sanctions to counsel who engages in the fostering of an unfounded defense or pursues a defense for an improper purpose. Van Patten & Willard, *The Limits of Advocacy: A Proposal for the Tort of Malicious Defense in Civil Litigation*, 35 HASTINGS L.J. 891, 926 (1984) (citing cases). The difference between the adoption of the tort of malicious defense and the existing power of courts to levy sanctions is the nature and extent of the damages recoverable by the aggrieved party. Is a plaintiff less aggrieved when the groundless claim put forth in the courts is done defensively rather than affirmatively in asserting a worthless lawsuit for improper purposes? We think not.

■ We answer the first transferred question in the affirmative. In adopting, as a part of our common law, the tort of malicious defense, as we do today, we are mindful that fundamental changes in our jurisprudence must be brought about sparingly and with deliberation. *Cf. Bonte v. Bonte*, 136 N.H. 286, 616 A.2d 464 (1992) (Brock, C.J., and Batchelder, J., dissenting). Such a change was precipitated, for example, a quarter century ago, when Clifton Buttrick's car went off the road after its headlights failed, and we adopted the doctrine of strict liability in tort. *Buttrick v. Lessard*, 110 N.H. 36, 260 A.2d 111 (1969). The often quoted language of Oliver Wendell Holmes, Jr., from his first lecture to the Lowell Institute in Boston, provides background for what we do today:

> The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. In order to know what it is, we must know what it has been, and what it tends to become.

O.W. HOLMES, JR., THE COMMON LAW 1 (1881).

The defendants assert that no jurisdiction has to date adopted malicious defense as a cause of action. This, however, is only part of the story. The Supreme Court of South Carolina impliedly recognized the tort in *Cisson v. Pickens*, 186 S.E.2d 822, 825 (S.C. 1972). And relief has been granted where the tortious conduct took root in a cross complaint. *Bertero v. National General Corp.*, 529 P.2d 608, 616 (Cal. 1975). In *Bertero*, the California court declined to adopt

the tort of malicious defense yet found that a malicious prosecution claim could be grounded on the cross complaint. *Id.* In such cases the injury and expenses to the individual and the harm to the judicial system are the same irrespective of whether the conduct had its origins in the defense of a claim or in a cross claim in the same case. *See* Van Patten & Willard, *supra* at 894.

Moreover, anyone who has been a litigant knows that the fact of litigation has a profound effect upon the quality of one's life that goes far beyond the mere entitlement to counsel fees. Litigation is a disturbing influence to one degree or another. The litigant may have the benefit of skilled and conscientious counsel as well as a strong and well-founded case on the facts, but until such time as the favorable verdict is in hand beyond the reach of appeal, there is a day-to-day uncertainty of the outcome. One wonders about the availability of witnesses at the appropriate times and whether their information will be adequately imparted. One may have gnawing uncertainty about the myriad things that can go wrong in a lawsuit. Here, although the plaintiffs prevailed in their lawsuit, they did so at a price—in time, money, and uncertainty—that was substantially exacerbated by the alleged actions of Schroeder. If a factual predicate exists to support liability and a measure of the damages thus exacerbated, the plaintiffs are entitled to a remedy to that extent.

■ In adding malicious defense to our common law, we merely recognize that when a defense is commenced maliciously or is based upon false evidence and perjury or is raised for an improper purpose, the litigant is not made whole if the only remedy is reimbursement of counsel fees. It follows that upon proving malicious defense, the aggrieved party is entitled to the same damages as are recoverable in a malicious prosecution claim.

■ ■ Van Patten and Willard, *supra* at 923, note that "[t]he action for malicious defense is also needed to protect the integrity of the judicial process, to deal with dishonest and unethical behavior, and to discourage misuse and abuse of limited judicial resources." "When the lawyer goes beyond the role of counselor and intentionally initiates defensive action that harasses the plaintiff and that the attorney knows or should know is without a credible basis, then the attorney, no less than the client, should be liable." Van Patten & Willard, *supra* at 927.

Of course, the mere existence of a remedy for malicious defense will not serve as a license for its abuse. Malicious defense, like its counterpart malicious prosecution, is a limited cause of action that will lie only in discrete circumstances, and malicious defense claims

will accordingly be scrutinized closely and construed narrowly. *Cf. Barquis v. Merchants Collection Ass'n of Oakland*, 496 P.2d 817, 824 n.4 (Cal. 1972) (characterizing malicious prosecution as a "narrowly circumscribed" cause of action). We would not, for example, look favorably upon a plaintiff's threatening a malicious defense action when faced with a defendant's general denial of liability, for a party should not be precluded from legitimately raising a defense for fear of such an action. *Cf. Melvin v. Pence*, 130 F.2d 423, 426 (D.C. Cir. 1942). Similarly, we would not sanction threats of malicious defense litigation as a means to gain tactical advantage, intimidate counsel, curtail legitimate discovery, or enhance settlement prospects. And a malicious defense action would not be the proper recourse for a plaintiff merely dissatisfied with a monetary judgment, for in that instance sufficient mechanisms for relief already exist in our law. *See Belanger v. Teague*, 126 N.H. 110, 111, 490 A.2d 772, 772 (1985) (additur may be sought "as alternative relief on a motion for a new trial on the ground of inadequate damages").

■ In answer to the second transferred question, regarding the elements of malicious defense, we adopt the following standard:

> One who takes an active part in the initiation, continuation, or procurement of the defense of a civil proceeding is subject to liability for all harm proximately caused, including reasonable attorneys' fees, if
>
> (a) he or she acts without probable cause, *i.e.*, without any credible basis in fact and such action is not warranted by existing law or established equitable principles or a good faith argument for the extension, modification, or reversal of existing law,
>
> (b) with knowledge or notice of the lack of merit in such actions,
>
> (c) primarily for a purpose other than that of securing the proper adjudication of the claim and defense thereto, such as to harass, annoy or injure, or to cause unnecessary delay or needless increase in the cost of litigation,
>
> (d) the previous proceedings are terminated in favor of the party bringing the malicious defense action, and
>
> (e) injury or damage is sustained.

Van Patten & Willard, *supra* at 933-34. These elements essentially mirror those required to prove the tort of malicious prosecution. *See ERG, Inc. v. Barnes*, 137 N.H. 186, 190, 624 A.2d 555, 558 (1993); *cf.* RESTATEMENT (SECOND) OF TORTS § 674 (1976).

■ It has been suggested that a malicious defense action should not contain as an element termination of the previous proceedings in

favor of the party asserting the malicious defense claim. In malicious prosecution actions, the "termination" requirement serves "to avoid inconsistent verdicts and to avoid prejudice to the plaintiff's case by the introduction of evidence of plaintiff's intent." Van Patten & Willard, *supra* at 928 (footnotes omitted). Requiring that the termination be favorable "tends to eliminate unnecessary litigation, for a defendant who loses in the principal action will not institute a malicious prosecution suit, since the adverse judgment operates to establish conclusively that the plaintiff had probable cause." *Babb v. Superior Court of Sonoma County*, 479 P.2d 379, 382 (Cal. 1971). We see no reason why these principles would not be equally applicable to the malicious defense context.

The third transferred question asks to what extent an attorney's law firm could be subject to suit under the same theory. The relationship between Schroeder and his law firm, as well as the status of the firm as an entity, is not contained in the record available to us. Consequently, we decline at this time to respond, as the answer in the first instance is best left to the sound discretion of the trial court. Based upon the facts presented to it and in light of applicable legal principles, the trial court can best determine the liability, if any, of a malicious attorney's law firm. *See* RSA ch. 304-A (1984) (UNIFORM PARTNERSHIP ACT); RSA ch. 294-A (1987 & Supp. 1994) (professional corporations).

 The fourth transferred question concerns the trial court's ruling that the defendants could not attack the award of relevant attorney's fees to the plaintiffs in the underlying case. The plaintiffs argued below, as they do here, that because the court in the underlying case specifically approved the award, the defendants were collaterally estopped from contesting the reasonableness of its appropriate components. We vacate and remand.

> The elements of collateral estoppel are well-established: the issue subject to estoppel must be identical in each action and the finding must have been essential to the first judgment; the party to be estopped must have appeared in the first action or have been in privity with someone who did, and must have had a full and fair opportunity to litigate the issue; and the first action must have resolved the issue finally on the merits.

*Day v. N.H. Retirement System*, 138 N.H. 120, 122, 635 A.2d 493, 495 (1993). As between a party and a non-party, "privity" requires "virtual representation" and "substantial identity," *id.* at 123, 635 A.2d at 495, such that the interests of the non-party "were in fact represented and protected in the [prior] litigation," *Daigle v. City of*

*Portsmouth*, 129 N.H. 561, 571, 534 A.2d 689, 694 (1987) (quotation omitted).

■ The plaintiffs thus had to demonstrate in the proceedings below that defendant Schroeder exerted such control over the underlying litigation that he should be bound by a determination against the underlying defendants as though he himself were a party. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 39 (1982). It appears, however, that the plaintiffs presented no evidence in support of this position. The trial court apparently agreed with the plaintiffs' assertion that Schroeder was in privity with the underlying defendants because he allegedly created the "false" defense and then acted as a co-conspirator in presenting that defense. Such an assertion, standing alone, does not warrant a determination that Schroeder's involvement in the underlying action was so significant as to constitute control. Accordingly, we vacate the trial court's decision and remand to the trial court for factual findings on this issue. *See id.*, comment *c* at 384 (outlining criteria for consideration in determining whether involvement is extensive enough to constitute control).

The final transferred question involves the trial court's order that the plaintiffs produce all documents relating to the underlying case. The plaintiffs maintain that the requested documents are protected by the attorney-client privilege and work product doctrine. The defendants, on the other hand, argue that the plaintiffs impliedly waived the attorney-client privilege when they placed at issue their litigation costs in the underlying suit.

We have not previously addressed the question whether a party waives the attorney-client privilege by affirmatively pleading a claim that places at issue the subject matter of privileged communications. We have acknowledged that in certain circumstances evidentiary privileges must yield to countervailing considerations. *See, e.g., Nelson v. Lewis*, 130 N.H. 106, 109, 534 A.2d 720, 722 (1987) (patient partially waives physician-patient privilege by putting medical condition at issue in medical negligence suit); *McGranahan v. Dahar*, 119 N.H. 758, 764, 408 A.2d 121, 125 (1979) (attorney-client privilege may not be absolute when "there is a compelling need for the information and no alternative source is available"). And the principle of "at-issue" waiver of the attorney-client privilege appears to be well-accepted in American jurisprudence. *See Mountain States Tel. & Tel. v. DiFede*, 780 P.2d 533, 543 (Colo. 1989) (citing cases); *Developments in the Law—Privileged Communications*, 98 HARV. L. REV. 1450, 1637 (1985).

The defendants suggest we adopt the test for at-issue waivers of the attorney-client privilege articulated in *Hearn v. Rhay*, 68 F.R.D.

574 (E.D. Wash. 1975). In *Hearn*, the court ruled that an implied waiver of the privilege is appropriate when: (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) the party asserting the privilege placed the protected information at issue; and (3) application of the privilege would deny the opposing party information vital to its case. *Id.* at 581; *accord Mountain States Tel. & Tel.*, 780 P.2d at 543-44; *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989).

The *Hearn* test has been criticized for neglecting fairness concerns and the systemic importance of the attorney-client privilege itself. *See Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408, 413-14 (D. Del. 1992); *see also* Davidson & Voth, *Waiver of the Attorney-Client Privilege*, 64 OR. L. REV. 637, 646-50 (1986). As one court has observed, the *Hearn* test "ignores the rationale of the attorney-client privilege: to encourage those in need of legal counsel to seek it in an atmosphere of candor and confidence." *Koppers Co., Inc. v. Aetna Cas. and Sur. Co.*, 847 F. Supp. 360, 363 (W.D. Pa. 1994).

We find merit in these criticisms of the *Hearn* standard. We therefore limit the extent of an at-issue waiver of the attorney-client privilege to circumstances "in which the privilege-holder injects the privileged material itself into the case." Marcus, *The Perils of the Privilege: Waiver and the Litigator*, 84 MICH. L. REV. 1605, 1633 (1986); *cf. Nelson*, 130 N.H. at 110, 534 A.2d at 722 (waiver of physician-patient privilege extends only to information relevant to plaintiff's claim). When the party asserting the privilege has injected privileged material into the case, such that the information is actually required for resolution of the issue, the privilege-holder "must either waive the attorney-client privilege as to that information or . . . be prevented from using the privileged information to establish the elements of the case." *Remington Arms Co.*, 142 F.R.D. at 415.

In this case, the trial court ordered the plaintiffs to produce "all documents . . . relative to the underlying case." In light of the standard announced today, this ruling may be overbroad. Accordingly, we vacate and remand to the trial court to determine in the first instance whether the plaintiffs, by initiation of their claim, have necessarily injected privileged material into the case and, further, whether such information is actually required for resolution of the plaintiffs' claim. With respect to the plaintiffs' assertion that certain documents are protected under the work product doctrine, we remand to the trial court to determine whether the defendants have demonstrated a substantial need for the requested materials, and

also whether the defendants could not without undue hardship obtain the materials by other means. *See* SUPER. CT. R. 35(b)(2).

*Vacated and remanded.*

THAYER, J., dissented; the others concurred.

THAYER, J., dissenting: Because I believe the majority's recognition of a tort of malicious defense is unwise as a matter of policy, I respectfully dissent.

In *Rockhouse Mountain Property Owners Association, Inc. v. Town of Conway*, 127 N.H. 593, 503 A.2d 1385 (1986), this court acknowledged that recognition of a new cause of action is a question of policy that turns on whether the interest asserted by the plaintiffs should be legally recognized, and, if so, whether the relief sought is the appropriate way to recognize the interest. *Id.* at 597-98, 503 A.2d at 1387-88. The defendants in this case do not dispute that the plaintiffs have a legitimate interest in pursuing a civil suit "without confronting falsified testimony or evidence." The question to be addressed, then, is whether allowing a separate cause of action for malicious defense is an appropriate recognition of this interest. For two reasons, I believe it is not. First, plaintiffs who face a malicious and unfounded defense already have at their disposal adequate remedies for the injuries they may suffer. Second, the differences between a malicious prosecution and a malicious defense fully warrant the existing discrepancy in remedies.

We have long recognized a court's inherent power to award attorney's fees "where one party has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons,' where the litigant's conduct can be characterized as unreasonably obdurate or obstinate, and where it should have been unnecessary for the successful party to have brought the action." *Harkeem v. Adams*, 117 N.H. 687, 690-91, 377 A.2d 617, 619 (1977) (citations omitted). More generally, we have observed that "a constitutionally created court [has the] power to award counsel fees in any action commenced, prolonged, required or defended without any reasonable basis in the facts provable by evidence, or any reasonable claim in the law as it is, or as it might arguably be held to be." *Keenan v. Fearon*, 130 N.H. 494, 502, 543 A.2d 1379, 1383 (1988). Thus, under existing law, a plaintiff aggrieved by a maliciously interposed defense normally has recourse to a motion for attorney's fees. In addition, sanctions may be imposed for out-of-pocket expenses associated with the litigation. *See Emerson v. Town of Stratford*, 139 N.H. 629, 632–33, 660 A.2d 1118, 1121 (1995). Sanctions based on attorney's fees and out-of-pocket costs, along with statutory costs, will usually compensate a

plaintiff for all or most of the damage resulting from a malicious defense.

Furthermore, under appropriate circumstances an opposing party's *attorney* may be held personally liable for counsel fees. In *Keenan,* for example, we ruled that a plaintiff's attorney who filed an appeal unauthorized by the plaintiff was personally liable for the defendant's resulting counsel fees. As the majority suggests, there may be ample reason to extend such sanctions to an attorney who knowingly raises or participates in raising an unfounded defense.

A plaintiff is also protected from malicious defense by the court's discretion to set aside a fraudulently obtained judgment. "A judgment may always be annulled for sufficient cause. Fraud to which the mover is not a party . . . may afford such a sufficient cause." *Lamarre v. Lamarre,* 84 N.H. 441, 444, 152 A. 272, 274 (1930) (citations omitted). Finally, although offering no direct relief to plaintiffs, misconduct of the type complained of in this case may be deterred by the possibility of criminal sanctions where perjury is part of the malicious defense, *see, e.g., State v. Sands,* 123 N.H. 570, 467 A.2d 202 (1983), or by the threat of professional disciplinary proceedings, *see, e.g., Jones' Case,* 137 N.H. 351, 628 A.2d 254 (1993).

The majority correctly observes that the damages potentially available in an action for malicious prosecution, *see Hogan v. Robert H. Irwin Motors, Inc.,* 121 N.H. 737, 742, 433 A.2d 1322, 1326 (1981); RESTATEMENT (SECOND) OF TORTS § 681 (1976), exceed those currently available through an award of sanctions to a plaintiff aggrieved by a malicious defense. This discrepancy, however, is fully justified by the differences between a malicious prosecution and a malicious defense.

The malicious plaintiff in a civil action institutes proceedings without probable cause and with malice. *ERG, Inc. v. Barnes,* 137 N.H. 186, 190, 624 A.2d 555, 558 (1993). Because the defendant is haled into court, all of the defendant's resulting financial, emotional, and reputational injuries are attributable to the plaintiff's malicious conduct. The malicious defendant, in contrast, raises or continues an ungrounded and malicious defense merely to resist the claim of a plaintiff already before the court. Unlike the defendant targeted by a malicious prosecution, the plaintiff who encounters a malicious defense voluntarily entered the judicial system and must be held to accept, to some degree, the costs and risks of litigation. When this plaintiff ultimately prevails in the action, at best only a portion of the plaintiff's litigation costs and damages can be attributed to the malicious defense.

These differences in the position of a plaintiff and a defendant with regard to the institution of civil proceedings, the willingness of the involvement in the litigation, and the amount of damages attributable to the malicious conduct of the opposing party, are appropriately recognized by the existing discrepancy in remedies.

The majority's similar treatment of parties in dissimilar positions may have untoward consequences. Plaintiffs dissatisfied with an award in the underlying suit will be sorely tempted to initiate a malicious defense proceeding in order to augment their recovery. Also, when the defendant in the underlying action is judgment-proof, the plaintiff may view a malicious defense action as a vehicle for extending the reach of liability to attorneys, their firms, and, possibly, third parties. The potential for increased litigation is obvious.

Recognition of a tort of malicious defense may also undermine "the right of a defendant, involuntarily haled into court, to conduct a vigorous defense." *Bertero v. National General Corporation,* 529 P.2d 608, 615 (Cal. 1975). The possibility that a vigorous defense may later be characterized as malicious could have a chilling effect on some legitimate defenses and perhaps drive a wedge between defendants seeking zealous advocacy and defense attorneys who fear personal liability in a second action. This potential for conflict between the interests of defendants and their attorneys can only be expected to undermine the goals of New Hampshire Rules of Professional Conduct 1.6 and 1.7. Attorneys may give priority to their own interests when formulating defense strategies, and they may be tempted to disclose the client's role in pursuing specific defense tactics in order to shield themselves from personal attack.

In addition, a tort of malicious defense may threaten our rule that "statements made in the course of judicial proceedings are absolutely privileged from civil actions, provided they are pertinent to the subject of the proceeding." *McGranahan v. Dahar,* 119 N.H. 758, 763, 408 A.2d 121, 124 (1979); *see generally* 60A AM. JUR. 2D *Perjury* § 132 (1988) (noting that "[a]s a general rule, no civil action lies for damages resulting from false statements under oath constituting perjury"). The purpose of this rule is "to encourage participants in litigation, parties, attorneys, and witnesses, to speak freely in the course of judicial proceedings." *McGranahan,* 119 N.H. at 763, 408 A.2d at 124. Where the alleged misconduct consists in part of false statements made in the underlying proceedings, as in the instant case, allowing an action for malicious defense may counteract our stated policy.

A tort of malicious defense may also further erode the attorney-client privilege, as amply demonstrated by the case at bar. In

*McGranahan,* we observed that "[t]he attorney-client privilege may not be absolute when there is a compelling need for the information and no alternative source is available." *Id.* at 764, 408 A.2d at 125. This court today finds an implied waiver of the privilege in circumstances "in which the privilege-holder injects the privileged material itself into the case." The newly-minted tort of malicious defense will probably involve, in most cases, a claim by the plaintiff that the defendant is liable for all or a portion of the plaintiff's attorney's fees from the underlying action. This in turn will require an inquiry into the portion of these fees that is in fact attributable to the malicious defense. It is difficult to imagine how such an inquiry could be conducted without a highly invasive review of documents normally protected by the attorney-client privilege.

The tort of malicious defense as adopted by the majority suffers from an additional defect. The majority defines malicious defense to require that the underlying proceedings have terminated in the plaintiff's favor. In other words, the plaintiff has to win the initial suit in order to take advantage of this newly created cause of action. Thus, a defendant whose egregious conduct is unsuccessful in obtaining a defendant's verdict may be subject to a malicious defense action, but a defendant whose egregious conduct successfully defeats the plaintiff's suit is not liable. This unlikely result gives the remedies available through a malicious defense action only to those plaintiffs who least need it, *i.e.*, those who prevailed despite the malicious defense.

That malicious defense is not a desirable addition to the tort law of New Hampshire is evidenced by the fact that no other jurisdiction in the country has explicitly recognized this cause of action. In *Eastin v. Bank of Stockton,* 4 P. 1106, 1109-10 (Cal. 1884), the California Supreme Court rejected in dicta the concept of a malicious defense action. That court repeated this rejection in *Bertero v. National General Corporation,* 529 P.2d 608, and a California appeals court recently stated flatly: "Broadly but nevertheless accurately speaking, there is no tort of 'malicious defense.'" *California Physicians' v. Superior Court,* 12 Cal. Rptr. 2d 95, 96 (Ct. App. 1992). The Supreme Court of Kansas explicitly rejected a proposed malicious defense action in *Baxter v. Brown,* 111 P. 430 (Kan. 1910). In an oft-quoted passage in *Ritter v. Ritter,* 46 N.E.2d 41, 44 (Ill. 1943), the Supreme Court of Illinois held:

> Under our jurisprudence the defendant may present any defense to such an action that he may have or that he may deem expedient, and in so doing he will not be subjecting himself to a second suit by the plaintiff based on the

wrongful conduct of the defendant in causing the plaintiff to sue him or in defending the action. The rule is the same even though the wrongful conduct of the defendant is willful, intentional, malicious or fraudulent.

An Indiana court recently endorsed this passage in *Levinson v. Citizens National Bank of Evansville*, 644 N.E.2d 1264, 1268 (Ind. Ct. App. 1994).

For all of the foregoing reasons, I respectfully dissent.